PATRICK H. O'DONNELL, Admr.

*v.*

FRANKLIN MACVEAGH *et al.*

*Opinion filed October 26, 1903.*

MASTER AND SERVANT—*when master is not liable for servant's death.* An employer is not liable for the death of an employee who fell from a freight elevator to the bottom of the shaft, where it is not shown the elevator was defective or that the employer failed to observe any duty he owed to the employee, who was using the elevator for his own convenience without permission or right, and where the evidence fails to show what occasioned the fall.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. CHARLES G. NEELY, Judge, presiding.

EDGAR BRONSON TOLMAN, for plaintiff in error.

PAM, CALHOUN & GLENNON, (ALBERT E. DACY, of counsel,) for defendants in error.

Mr. JUSTICE RICKS delivered the opinion of the court:

This is an action of trespass on the case, begun by plaintiff in error in the circuit court of Cook county to recover damages for the death of Christian P. Lorenzen. Upon a hearing in the trial court a peremptory instruction to find the defendants not guilty was given the jury at the request of defendants in error. The plaintiff in error sued out of the Appellate Court a writ of error, and on a hearing in that court the judgment was affirmed. The Appellate Court having granted a certificate of importance, the case is brought to this court upon a writ of error.

The declaration contained five counts. The first three were based upon the violation of certain sections of the municipal code, but on the trial of the case no evidence was introduced under these counts. The fourth count

alleged that on October 7, 1898, the defendants were pos-
sessed of and were using a certain freight and passenger
elevator in a building occupied by them in Chicago, by
means of which premises it became and was the duty of
said defendants to maintain the said elevator, and the
appurtenances thereof, in such a condition as to be rea-
sonably safe for use by persons who should ride thereon,
but said defendants, disregarding their said duty, and
while so controlling and operating said elevator, wrong-
fully and negligently suffered the said elevator and its
appurtenances to be and remain and be operated in a dan-
gerous condition, so that the same was unsafe to ride on,
and while said Christian Peter Lorenzen, with all due
care and caution on his part for his own safety, was in
the employ of said defendants, and in the discharge of
his duties as such employee was being carried on said
elevator from the basement of said premises towards the
third floor of said premises, not knowing the said dan-
gerous condition of said elevator, said dangerous condi-
tion not being apparent to persons of ordinary knowledge
and prudence, he, said Lorenzen, by reason of said de-
fects of said elevator and of its appurtenances and by
reason of the dangerous condition thereof, was then and
there thrown down, and fell down said elevator shaft
and killed by said fall.

The fifth count contains the same allegation as to the
possession, control and operation of a certain freight ele-
vator as set out in the former count, and of the duty "to
operate said elevator in such manner as to be reasonably
safe for use by persons who should ride thereon," and
as a breach of duty the count alleges that the defendants
"wrongfully and negligently suffered said freight eleva-
tor to be operated by one of their employees not on said
elevator, where the said persons so operating said ele-
vator could not see the persons who might be on said
elevator, or see whether or not they were getting on or
off of said elevator, or whether or not they had completed

the act of getting on or off said elevator, or whether or not they were in such a position on said elevator as to be safe for said elevator to be in motion." It then alleges that while said Lorenzen, with due care and caution on his part for his own safety, was in the employ of said defendants and in the discharge of his duty as such employee, and being carried on said elevator from the basement of said premises towards the upper floor of said premises, he, said Lorenzen, "by reason of the fact that the said elevator was then and there being operated by a person not on said elevator in such a position that he, the said person so operating said elevator, could not see him, the said Christian Peter Lorenzen, nor the said elevator," said Lorenzen was, by reason of the aforesaid defective and dangerous method of operation of the said elevator, then and there thrown down, and fell down said elevator shaft and killed by said fall.

The only question presented to this court arises upon the peremptory instruction given by the trial court to the jury. This question is one of law, and is, was there evidence adduced before the jury which, with all the legitimate and natural inferences to be drawn therefrom, fairly tended to support the cause stated in the declaration, or any count thereof?

Only two witnesses were produced upon the trial,— the widow of the deceased, who did not know of her own knowledge how he came to his death and gave only general information as to his age, occupation, etc., and one Charles Schreiber, who was employed by the defendants as engineer, he being the only witness who gave testimony as to what occurred on the evening in question. His evidence is substantially as follows: "On the 7th or 8th of October, 1898, I was employed by Franklin Mac-Veagh & Co. in their refinery. There was one engine there and the elevator engine. I had charge of both of them. There was just the one elevator. The building was four stories and a basement. There was no person

there in charge of or operating that elevator. It was used by every man in the place except that man that got killed. It was a freight elevator to take freight up and down. I was there about a year and two months before the death of Lorenzen. Lorenzen was there when I came. I seen him until he got killed. It was around seven or eight o'clock in the evening. At that time I was engineer for the building. My duties were to look after the machinery, repairs, and one thing and another around the place. At the time of the occurrence I was up on the third floor. I went up on the elevator and got off at the third floor. I next went to pack a couple of valves up there on the third floor at the kettles. After I packed the valves I went back to the elevator. I wanted to go down. I hollered at the elevator. I wanted to take it up. I looked over into the shaft. A man was coming up. Mr. Greenwood was coming up. He told me to wait. I says, 'All right.' I heard Mr. Greenwood holler that he was coming up. I looked over the elevator and waited to see why the elevator didn't come. When I looked over the gate into the elevator shaft I seen Greenwood there and old man Lorenzen on the elevator. As soon as I saw the elevator coming up I stepped back from the elevator. It stopped at the second floor and it stopped between the second and third floor, because I stepped back just before or at the time the elevator stopped at the second floor. I gave Mr. Greenwood instructions to send the elevator up to me when he got off; that I would stop it and take the old gentleman up,—Mr. Lorenzen. Well, he started the elevator up to come to me. In the meantime he hollered to me that Mr. Lorenzen was in the elevator shaft,—not to touch the elevator. He told me not to touch the elevator,—that the old man was caught in it; and the elevator came up past the third floor and I stopped the elevator there. When I called down to Mr. Greenwood to send up the elevator he said he would send the elevator up to me. He said all right, he would

send it up. I knowed where the old man wanted to go.
The elevator came up to the third floor empty. After
the time that I looked over and saw the elevator below
and Mr. Lorenzen on it I did not see the elevator or him
on it again. I did not look over again. When the ele-
vator came up I stopped it. It got beyond the floor.
I seen there was nobody in it. I left it stand there. I
heard the racket that the old man was down in the shaft,
and I left the elevator standing on the third floor and
I walked down to the second floor and saw the gates
broke. The gates which were connected with this ele-
vator work automatically with the elevator. When the
elevator went up they opened; when she went down they
open also. These gates closed when the elevator was in
motion after it had passed the floor. The condition of
this gate on the second floor, when I got there, was all
right, only that the grooves that she ran in on one side
were jammed out,—sprung out of those grooves. We un-
tied the gate off of there, and we took off this piece that
starts the gate up and down. There was a kind of up-
and-down business that started this gate where the ropes
went into, and we put a piece of two-by-four in front of
the elevator for a bar,—a cross-piece,—and then we ran
ahead. I got the elevator down from the third floor to
the second. I goes down to the basement. In the mean-
time they had the old gentleman over to the hydrant in
the basement. I saw him there. He was breathing his
last. That is all I seen of it. I stayed there about ten
minutes. He was dead before I went away. I then went
and took the elevator down and commenced to run up
and down to see if everything was all right on the ele-
vator. Lorenzen's body was taken away in the patrol
wagon. There was a superintendent in charge of this
building,—a Mr. Lemke. I had a talk with him about
this elevator about two months before this accident.
I told him to put a man on that elevator. If they did
not there would be something happen there and he would

be held responsible. Lemke made no reply. During the time I was there the elevator remained the same,—the same elevator, the same machinery. After Lorenzen was found dead I ran the elevator down and the machinery was all right. I was the engineer in charge of the machinery. I done the firing myself. I was alone there. I did not have any man in the basement to help me, only when I done work in the building. They gave me almost everybody. They had a man named Julius who worked there. I don't remember whether he was there the day of the accident or not. I don't know whether or not he was the first man who got to Lorenzen. I hollered that the elevator was on the third floor. There was a bell on the elevator. I rung and hollered, both. At the same time I looked over into the shaft and saw Mr. Greenwood on the elevator at the ground floor. I saw Mr. Lorenzen get on with him. I saw them get on. I could see the elevator start to go upward. I could see it by the cable. As soon as the elevator started I stepped back, so that I would not get caught on the gates. I went back a foot or a foot and a half from the gates as soon as I saw the elevator coming from the second floor. I remained at that distance away until the elevator came up to the third floor. During all the time I was about a foot away from the shaft. I could not see the elevator after it started up,—all I could see were the cables moving. If the elevator didn't stop at the second floor it came pretty near it. I couldn't see the elevator stop at the second floor. The last time I saw the elevator was when it was leaving the first floor. I saw the cable. The next time I saw the elevator was when it was even with and had passed the third floor. Then I stopped it. The gates on the elevator were the Richardson safety gates. The elevator was operated—propelled—by steam, and the steam was supplied from the engine in the basement. There were two engines in the basement,—the elevator engine and another engine. The main engine in the basement

had a supply pipe which ran over to the other engine and supplied steam for the elevator engine. I had no fireman. I done my own firing. Nobody else had any charge of the engines except me. The engine was in first-class condition before and after the accident. The appliances on the elevator, with the exception of the gates, were in working order—with the exception of the gate that was bulged out. No repairs were made on the elevator except to replace this gate. Otto Lemke was the superintendent in charge of this building. He was the man who gave orders around there. There was nobody else who gave orders except him. Lorenzen, Greenwood and I were all working under Lemke. There was no intermediate man between Lemke and us. He was the only man who had authority to give orders, and the rest of us all worked under him. I had no authority to give Greenwood orders or Lorenzen orders, and Lorenzen had no authority to give me orders. I got my orders from Lemke. When I stepped away from the shaft I could see the elevator cables. Greenwood was a kind of porter. He kind of marked up goods and got them down on the first floor, and one thing and another like that."

Mrs. Lorenzen also testified she saw deceased when he went to work the morning of the injury. She said he never drank intoxicating liquors; that the condition of his health and body was good, and that at the time of the accident his hearing and eyesight were unimpaired.

We think it clear that there is no proof of the cause of action alleged in the fourth count of the declaration. There is no evidence which tends to show that the elevator or its appurtenances were in a dangerous condition. On the contrary, the evidence shows all the appliances of the elevator were working in proper and reasonably safe manner. The record is entirely barren of any testimony tending to show that the gate to the elevator was bulged out at the time of the accident.

Neither did the evidence in the case sustain the fifth count of the declaration. Plaintiff in error has devoted much space in his argument to the proposition that it was the duty of defendants in error to employ an elevator conductor to pilot this elevator for the safety of the passengers. The evidence shows beyond question that the elevator was a freight elevator, and was used for transporting freight from floor to floor in the building. The defendants in error had not provided this elevator as a conveyance for plaintiff in error's intestate, but had provided him with other means to reach the various floors of the building. The evidence shows that although Lorenzen had been in the employ of defendants in error for seven years he had never used this elevator before, or at least not more than once before the time of his injury. Lorenzen was not required, in the performance of his duties, to be upon the freight elevator. Indeed, he had no business thereon; and when defendants in error had provided him with a reasonably safe means of transportation between the floors, they are not answerable to plaintiff in error for any injuries that may have occurred to Lorenzen by reason of his seeking out this dangerous means of conveyance, with the operation of which he was entirely ignorant. *Jorgenson* v. *Johnson Chair Co.* 169 Ill. 429.

Again, the evidence is uncontradicted that Lorenzen was guilty of a high degree of negligence, which contributed to his injury. Plaintiff in error discusses this proposition as though Lorenzen was in the exercise of due care for his own safety if he took proper care of himself after getting on the elevator; but Lorenzen's negligence which contributed mostly to this injury consisted in getting on the elevator at all, and in his remaining in the elevator alone when he was entirely unfamiliar with the operation thereof, trusting to reach his destination in safety by having Greenwood send the elevator on from the second floor and expecting it to be stopped by Schreiber on the third floor. So far as the evidence

discloses, defendants in error exercised due care in providing this elevator for the purposes for which it was intended, with all the equipment that was necessary; and it is also clearly established that the elevator and its attachments were in good and safe working order, and the evidence does not show that for the purpose of carrying freight it was necessary, in the operation of this elevator, that anyone should be placed in charge of it and ride upon it while being operated. If plaintiff in error's intestate desired to appropriate this elevator to other uses than those for which it was placed there by defendants in error, for his own personal convenience, he did so at his own peril. The evidence does not show the existence of such a custom on the part of defendants in error's employees in riding upon this elevator, or such knowledge on the part of defendants in error of such custom, as would require them to make provision therefor by placing some one especially in charge of this elevator to operate it. Furthermore, the record is entirely barren, as to evidence, as to the manner in which plaintiff in error's intestate came to his death. It is not shown that he was injured because there was no conductor in charge of the elevator, nor was it shown that the accident was due to defective machinery. So far as it appears from the evidence, Lorenzen would have been as likely to have come to his death in the manner he did had there been a conductor in charge of the elevator and in the proper discharge of his duties. It plainly appears he was not to get off at the second floor, but was to go above the third floor, where Schreiber was located, and who was to stop the elevator at the third floor when it reached there and take Lorenzen to the floor to which he desired to go. To charge defendants in error with liability there must have been a duty that was not observed or performed, the failure of which was the inducing cause of the injury,—and this, we think, the evidence wholly fails to show.

As there was, under the evidence, no ground whatever upon which plaintiff in error could recover, the court properly instructed the jury to find a verdict for defendants in error.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*